## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
www.flsb.uscourts.gov

In re:   Alteneez Moss,                              Case No.18-15361-LMI

                                                     Chapter 13

        Debtor(s)

_____/

## DEBTOR'S CLOSING ARGUMENT

      There are two issues before this Court: Ms. Moss' objection to the Landlord's proof of claim [Claim #1] asserting that Ms. Moss is responsible for the County's unpaid housing assistance payments and the Landlord's motion for relief from stay to proceed on its eviction for non-payment of rent [D.E. 18]. Ms. Moss does not have any liability for the unpaid housing assistance payments ("HAP") which were withheld by the County. Under both the terms of the lease agreement and HUD's Section 8 Moderate-Rehabilitation ("Mod-Rehab") regulations, a tenant is not liable for unpaid HAP caused by a failed inspection, even if the tenant contributed to the failed inspection. The Landlord is asking this Court to read language into the contract that does not exist and create liability where none exists.

      If Ms. Moss is not liable for the unpaid HAP, the Landlord is not entitled to relief from stay to pursue the pending eviction for non-payment of rent. However, this does not leave the Landlord without a remedy. The Landlord has always been entitled to demand that Ms. Moss cure her lease violation and then proceed with an eviction if Ms. Moss does not cure within the time mandated by Florida's Landlord-Tenant Act (Chapter 83, Florida Statutes). But, the Landlord chose not to pursue this remedy. Instead, it monetized the alleged lease violation,

1

demanded the unpaid HAP from Ms. Moss, and then sought to evict her for not paying the County's portion of the rent.

**The lease agreement does not make Ms. Moss liable for the unpaid HAP.**

The lease between Ms. Moss and the Landlord clearly states in paragraph 1 that Ms. Moss is only liable to pay her portion of the rent -- the amount of rent set by the County. ("The total rent to be paid by the TENANT over the term of this Lease is $2,508.00, or as adjusted by the Dade County SHPD.") See Exhibit 1. Beginning April 2017, the County set Ms. Moss' rent at $223 and the Landlord received $569 as the HAP.  *See* Exhibit 2. In April 2018, while the HAP remained in abatement, the County increased the HAP to $585 and Ms. Moss' portion of the rent remained at $223. *See* Exhibit 3. Under the contract, Ms. Moss' liability is limited to $223 per month and the parties stipulated that Ms. Moss always paid her portion of the rent.

The Landlord argues that Ms. Moss became liable for the full contract rent when the HAP stopped as a result of the clutter in her apartment. The Landlord's proposition is not supported by any provision of the lease. The lack of applicable language can be compared to and contrasted with two other paragraphs which create potential liability based upon the tenant's actions. Paragraph five of the lease creates an obligation that the tenant must repay the landlord if the tenant submits false or misleading income and recertification information to the County and the County retroactively decreases the HAP because of the tenant's false information. When this happens, paragraph five requires the tenant to pay the Landlord for any unpaid HAP.  In paragraph 14, if the tenant causes physical damage to the unit, the tenant agrees to repay the landlord. There is not a similar paragraph which would obligate Ms. Moss to pay the Landlord when the County abates the HAP due to her clutter.

At the hearing, Mr. Selesky testified that the Landlord drafted the lease agreement used by the Landlord, as opposed to a form lease provided by the County. While the lease is clear and unambiguous that Ms. Moss has no liability for the HAP, if the Court were to find any ambiguity in the lease agreement, it should be construed against the drafter. *In re: Ramirez,* 2014 WL 1466212 (Bankr.S.D. Fla. 2014), *citing In re: Woodham*, 174 B.R. 346 (Bankr.M.D.Fla. 1994). The Landlord did not include a paragraph creating liability when the tenant bears responsibility for the HAP abatement, yet it chose to include other lease provisions creating tenant liability under certain circumstances. This Court should construe any ambiguity in the lease against the Landlord.

### The Mod-Rehab regulations do not make Ms. Moss liable for the unpaid HAP – even when the inspection violations are related to her hoarding personal belongings.

Any lease agreement for a tenant in the Mod-Rehab program must be read and interpreted consistently with the HUD regulations because the lease cannot "include any provisions prohibited by HUD." 24 C.F.R. § 882.511(a)(1). If there was a conflict between the lease and regulations, the Mod-Rehab regulations would supersede the lease, but there is no conflict in this situation. The lease between Ms. Moss and the Landlord, which does not make Ms. Moss liable for the unpaid HAP, is consistent with the federal regulations which impose the obligation to maintain the premises on the Landlord.

Landlords in the Mod-Rehab Program must maintain decent, safe, and sanitary housing. *See* 24 C.F.R. § 882.404(a) and 24 C.F.R. § 5.703 (A copy of § 882.404(a) is attached as Exhibit A.  A copy of § 5.703 is attached as Exhibit B). Unlike the Section 8 Housing Choice Voucher Program, where inspectors attribute violations in a subsidized unit to either the tenant or the landlord, all inspection violations in the Mod-Rehab Program are the responsibility of the

landlord. *See* 24 C.F.R. § 882.404(a) and 24 C.F.R. §5.703 (Mod-Rehab regulations); *Cf.* 24 C.F.R. § 982.404(a)(4) (Section 8 Housing Choice Voucher inspection regulation) (A copy of § 982.404 is attached as Exhibit C). This is further borne out by the Mod-Rehab regulation which describes what happens when a unit fails an inspection. 24 C.F.R. § 882.516(c) states:

> **Units not decent, safe and sanitary.** If the PHA notifies the Owner that the unit(s) under Contract are not being maintained in decent, safe and sanitary condition and the Owner fails to take corrective action (including corrective action with respect to the Family where the condition of the unit is the fault of the Family) within the time prescribed in the notice, the PHA may exercise any of its rights or remedies under the Contract, including abatement of housing assistance payments (even if the Family continues in occupancy), termination of the Contract on the affected unit(s) and assistance to the Family in accordance with § 882.514(e). (A copy of § 882.516(c) is attached as Exhibit D.)

While, over the past year, there were many unsafe conditions at the unit which were entirely the responsibility of the Landlord, the Landlord always repaired those violations within the time provided by the County. The ongoing and uncorrected inspection violation was related to the clutter in Ms. Moss' unit caused by the hoarding of her personal belongings.

Mr. Silva, an inspector with Miami-Dade County, testified at the hearing that because of the Mod-Rehab regulations, inspection violations are always designated the responsibility of the landlord. Every inspection report, other than the November 20th inspection report, bears this out and the County always deemed the Owner responsible for the clutter. *See* Exhibits 4, 7, 9, and 15. Mr. Silva testified that the November 20th Notice (Exhibit 5), which attributed the violation to both the Landlord and Ms. Moss, was a mistake and should have been designated only as an owner violation. All of the subsequent inspection notices had the correct designation.

When an inspector finds a violation in the unit and the unit fails the inspection, the regulation instructs a landlord to take "corrective action with respect to the Family" when the unsafe condition is caused by the tenant. *See* 24 C.F.R. §882.516 (c). The regulation also gives

4

the PHA the ability to abate the HAP "even if the Family continues in occupancy." *See* 24 C.F.R. §882.516 (c). While this does not leave the landlord without a remedy, as discussed below, there is nothing in the regulation making the tenant personally liable for the HAP.

The regulation gives the County several options when there is a violation in the unit. Here, the County chose to abate the HAP to the Landlord, even though Ms. Moss remained in possession of the unit. As County employee Yvette Cunningham testified, the County did not terminate Ms. Moss's participation in the Mod-Rehab Program and, to this date, Ms. Moss remains an active participant.

### Notices sent by the County to the Landlord cannot change the parties' obligations under the lease or the federal regulations

Since the Landlord cannot rely on the lease agreement or the federal regulations to support its argument that Ms. Moss is liable for the unpaid HAP, the Landlord must rely on language in the County's notices sent to the Landlord which state that Ms. Moss could become responsible for the full rent. *See* Exhibit 5. ("<u>If any of the violations shown are the owner's responsibility</u>, then the tenant is entitled to request a change of dwelling within 21 days starting 11/17/17. If the tenant does not contact MDHA within this period and remains at the above mentioned unit, they will be responsible for the full contract rent."). However, a notice from the County to the Landlord cannot create liability that does not exist under the lease agreement or the federal regulations. County employee Yvette Cunningham testified consistently, explaining that language in the notice is incorrect since the tenant is not responsible for the HAP under the federal regulations. She also testified that the County is in the process of changing its forms to remove this improper language from the notices.

5

**<u>The Landlord is not without a remedy.</u>**

The Mod-Rehab regulation on maintenance instructs a landlord to "take corrective action" against a tenant who causes an inspection violation. *See* 24 C.F.R. § 882.516 (c). Florida law provides landlords with a specific mechanism and procedure to take corrective action when a tenant does not maintain the rental unit: a seven day notice to cure the lease violation pursuant to Fla. Stat. § 83.56 (2) (a). Here, it is undisputed and the parties stipulated that the Landlord never sent a statutory notice to cure asking Ms. Moss to take corrective action in the unit. Instead, it filed an eviction for non-payment of rent, incorrectly claiming that Ms. Moss was liable for the HAP. The Landlord has known of this procedural problem since Ms. Moss filed her answer to the eviction on February 2, 2018 (Miami-Dade County Court Case No. 18-1830-CC-23). Despite this, the Landlord has doubled-down on its attempt to demand money from Ms. Moss -- money that she does not owe.

Ms. Moss is not arguing to this Court that she has a right to violate the lease with impunity. But, she has a right to the process that Florida has guaranteed to all tenants. Process truly matters to tenants. When a landlord turns a non-monetary lease violation into an eviction for unpaid rent, it denies a tenant the right to cure the lease violation, and more importantly, it allows a landlord to use Florida Statute § 83.60 (2) to default a tenant and avoid proving their case at a trial. (Florida Statute § 83.60 (2) states that a tenant who fails to deposit all rent alleged by the landlord is evicted automatically by default.) And, that is exactly what happened in this case. The Landlord aggressively pursued this matter as a debt and tried to evict Ms. Moss by default since she could not deposit the HAP into the court registry. This forced Ms. Moss to seek bankruptcy protection to avoid liability for the HAP. Notably, nothing prevented the Landlord from serving Ms. Moss with a notice to cure demanding that she remove items from her

6

apartment and pursuing an eviction if she did not cure within the 7 days provided by statute.  But instead, the Landlord chose to aggressively pursue this as a non-payment case for nearly one year and it refuses to serve a statutory notice to cure on Ms. Moss. Ms. Moss has always agreed that the Landlord can have relief from stay to serve a notice to cure and file an eviction if necessary. But, it cannot have relief from stay to pursue an eviction for non-payment related to a debt she does not owe. This Court should sustain Ms. Moss' objection to the proof of claim and deny the Landlord's motion for relief from stay to pursue the eviction for the unpaid HAP.

## ATTORNEY CERTIFICATION

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Response was served via Notices of Electronic Filing on November 8, 2018, generated by the CM/ECF and served as follows:

**Served electronically:**

Nancy K. Neidich, Trustee
e2c8f01@ch13herkert.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Richard Robles, Esq.
rrobles@roblespa.com; nrossoletti@roblespa.com; vpuig@roblespa.com; rroque@roblespa.com; dgonzalez@roblespa.com; r49546@notify.bestcase.com

                                    Respectfully submitted,

                                    LEGAL SERVICES OF GREATER OF MIAMI, INC.

                     By   /s/ Jeffrey M. Hearne
                          Jeffrey M. Hearne
                          Florida Bar No. 512060
                          Attorney for Debtor
                          4343 West Flagler Street, Suite #100
                          Miami, FL 33134
                          Phone and Facsimile: (305) 438-2403
                          Email: Jhearne@legalservicesmiami.org
                          Alt: SFreire@legalservicesmiami.org

> Code of Federal Regulations
>   Title 24. Housing and Urban Development
>     Subtitle B. Regulations Relating to Housing and Urban Development
>       Chapter VIII. Office of the Assistant Secretary for Housing–Federal Housing Commissioner, Department of Housing and Urban Development (Section 8 Housing Assistance Programs, Section 202 Direct Loan Program, Section 202 Supportive Housing for the Elderly Program and Section 811 Supportive Housing for Persons with Disabilities Program) (Refs & Annos)
>         Part 882. Section 8 Moderate Rehabilitation Programs (Refs & Annos)
>           Subpart D. Special Procedures for Moderate Rehabilitation—Basic Policies (Refs & Annos)

24 C.F.R. § 882.404

§ 882.404 Physical condition standards; physical inspection requirements.

Currentness

(a) Compliance with physical condition standards. Housing in this program must be maintained and inspected in accordance with the requirements in 24 CFR part 5, subpart G.

(b) Space and security. In addition to the standards in 24 CFR part 5, subpart G, a dwelling unit used in the Section 8 moderate rehabilitation program that is not SRO housing must have a living room, a kitchen area, and a bathroom. Such a dwelling unit must have at least one bedroom or living/sleeping room for each two persons.

(c) Special housing types. The following provisions in 24 CFR part 982, subpart M (Special Housing Types) apply to the Section 8 moderate rehabilitation program:

  (1) 24 CFR 982.605(b) (for SRO housing). For the Section 8 moderate rehabilitation SRO program under subpart H of this part 882, see also § 882.803(b).

  (2) 24 CFR 982.609(b) (for congregate housing).

  (3) 24 CFR 982.614(c) (for group homes).

(d) Lead-based paint. The Lead–Based Paint Poisoning Prevention Act (42 U.S.C. 4821–4846), the Residential Lead–Based Paint Hazard Reduction Act of 1992 (42 U.S.C. 4851–4856), and implementing regulations at part 35, subparts A, B, H, and R of this title apply to the Section 8 moderate rehabilitation program.

**Credits**

[50 FR 38795, Sept. 25, 1985; 52 FR 1894, Jan. 15, 1987; 52 FR 9828, March 27, 1987; 53 FR 20801, June 6, 1988; 58 FR 4270, Jan. 13, 1993; 58 FR 8186, Feb. 11, 1993; 63 FR 23854, April 30, 1998; 63 FR 46579, Sept. 1, 1998; 64 FR 50227, Sept. 15, 1999]

EXHIBIT A

AUTHORITY: 42 U.S.C. 1437f and 3535(d).; Section 8(e)(5), U.S. Housing Act of 1937 (42 U.S.C. 1437f(e)(5)); Section 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)); Section 324, Housing and Community Development Amendments of 1981.

Notes of Decisions (57)

Current through November 2, 2018; 83 FR 55110.

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

> Code of Federal Regulations
>   Title 24. Housing and Urban Development
>     Subtitle A. Office of the Secretary, Department of Housing and Urban Development
>       Part 5. General HUD Program Requirements; Waivers (Refs & Annos)
>         Subpart G. Physical Condition Standards and Inspection Requirements (Refs & Annos)

24 C.F.R. § 5.703

§ 5.703 Physical condition standards for HUD housing
that is decent, safe, sanitary and in good repair (DSS/GR).

Currentness

HUD housing must be decent, safe, sanitary and in good repair. Owners of housing described in § 5.701(a), mortgagors of housing described in § 5.701(b), and PHAs and other entities approved by HUD owning housing described in § 5.701(c), must maintain such housing in a manner that meets the physical condition standards set forth in this section in order to be considered decent, safe, sanitary and in good repair. These standards address the major areas of the HUD housing: the site; the building exterior; the building systems; the dwelling units; the common areas; and health and safety considerations.

(a) Site. The site components, such as fencing and retaining walls, grounds, lighting, mailboxes/project signs, parking lots/driveways, play areas and equipment, refuse disposal, roads, storm drainage and walkways must be free of health and safety hazards and be in good repair. The site must not be subject to material adverse conditions, such as abandoned vehicles, dangerous walks or steps, poor drainage, septic tank back-ups, sewer hazards, excess accumulations of trash, vermin or rodent infestation or fire hazards.

(b) Building exterior. Each building on the site must be structurally sound, secure, habitable, and in good repair. Each building's doors, fire escapes, foundations, lighting, roofs, walls, and windows, where applicable, must be free of health and safety hazards, operable, and in good repair.

(c) Building systems. Each building's domestic water, electrical system, elevators, emergency power, fire protection, HVAC, and sanitary system must be free of health and safety hazards, functionally adequate, operable, and in good repair.

(d) Dwelling units.

> (1) Each dwelling unit within a building must be structurally sound, habitable, and in good repair. All areas and aspects of the dwelling unit (for example, the unit's bathroom, call-for-aid (if applicable), ceiling, doors, electrical systems, floors, hot water heater, HVAC (where individual units are provided), kitchen, lighting, outlets/switches, patio/porch/balcony, smoke detectors, stairs, walls, and windows) must be free of health and safety hazards, functionally adequate, operable, and in good repair.

> (2) Where applicable, the dwelling unit must have hot and cold running water, including an adequate source of potable water (note for example that single room occupancy units need not contain water facilities).

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    EXHIBIT B    1

(3) If the dwelling unit includes its own sanitary facility, it must be in proper operating condition, usable in privacy, and adequate for personal hygiene and the disposal of human waste.

(4) The dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit.

(e) *Common areas.* The common areas must be structurally sound, secure, and functionally adequate for the purposes intended. The basement/garage/carport, restrooms, closets, utility, mechanical, community rooms, day care, halls/corridors, stairs, kitchens, laundry rooms, office, porch, patio, balcony, and trash collection areas, if applicable, must be free of health and safety hazards, operable, and in good repair. All common area ceilings, doors, floors, HVAC, lighting, outlets/switches, smoke detectors, stairs, walls, and windows, to the extent applicable, must be free of health and safety hazards, operable, and in good repair. These standards for common areas apply, to a varying extent, to all HUD housing, but will be particularly relevant to congregate housing, independent group homes/residences, and single room occupancy units, in which the individual dwelling units (sleeping areas) do not contain kitchen and/or bathroom facilities.

(f) *Health and safety concerns.* All areas and components of the housing must be free of health and safety hazards. These areas include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits, flammable materials, garbage and debris, handrail hazards, infestation, and lead-based paint. For example, the buildings must have fire exits that are not blocked and have hand rails that are undamaged and have no other observable deficiencies. The housing must have no evidence of infestation by rats, mice, or other vermin, or of garbage and debris. The housing must have no evidence of electrical hazards, natural hazards, or fire hazards. The dwelling units and common areas must have proper ventilation and be free of mold, odor (e.g., propane, natural gas, methane gas), or other observable deficiencies. The housing must comply with all requirements related to the evaluation and reduction of lead-based paint hazards and have available proper certifications of such (see 24 CFR part 35).

(g) *Compliance with State and local codes.* The physical condition standards in this section do not supersede or preempt State and local codes for building and maintenance with which HUD housing must comply. HUD housing must continue to adhere to these codes.

AUTHORITY: 12 U.S.C. 1701x; 42 U.S.C. 1437a, 1437c, 1437d, 1437f, 1437n, 3535(d); Sec. 327, Pub.L. 109–115, 119 Stat. 2936; Sec. 607, Pub.L. 109–162, 119 Stat. 3051 (42 U.S.C. 14043e et seq.); E.O. 13279, 67 FR 77141, 3 CFR, 2002 Comp., p. 258; and E.O. 13559, 75 FR 71319, 3 CFR, 2010 Comp., p. 273.

Notes of Decisions (5)

Current through November 2, 2018; 83 FR 55110.

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

> Code of Federal Regulations
>   Title 24. Housing and Urban Development
>     Subtitle B. Regulations Relating to Housing and Urban Development
>       Chapter IX. Office of Assistant Secretary for Public and Indian Housing, Department of Housing and Urban Development (Refs & Annos)
>         Part 982. Section 8 Tenant–Based Assistance: Housing Choice Voucher Program (Refs & Annos)
>           Subpart I. Dwelling Unit: Housing Quality Standards, Subsidy Standards, Inspection and Maintenance (Refs & Annos)

24 C.F.R. § 982.404

§ 982.404 Maintenance: Owner and family responsibility; PHA remedies.

Currentness

(a) Owner obligation.

   (1) The owner must maintain the unit in accordance with HQS.

   (2) If the owner fails to maintain the dwelling unit in accordance with HQS, the PHA must take prompt and vigorous action to enforce the owner obligations. PHA remedies for such breach of the HQS include termination, suspension or reduction of housing assistance payments and termination of the HAP contract.

   (3) The PHA must not make any housing assistance payments for a dwelling unit that fails to meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within no more than 30 calendar days (or any PHA-approved extension).

   (4) The owner is not responsible for a breach of the HQS that is not caused by the owner, and for which the family is responsible (as provided in § 982.404(b) and § 982.551(c)). (However, the PHA may terminate assistance to a family because of HQS breach caused by the family.)

(b) Family obligation.

   (1) The family is responsible for a breach of the HQS that is caused by any of the following:

   (i) The family fails to pay for any utilities that the owner is not required to pay for, but which are to be paid by the tenant;

   (ii) The family fails to provide and maintain any appliances that the owner is not required to provide, but which are to be provided by the tenant; or

EXHIBIT C

(iii) Any member of the household or guest damages the dwelling unit or premises (damages beyond ordinary wear and tear).

(2) If an HQS breach caused by the family is life threatening, the family must correct the defect within no more than 24 hours. For other family-caused defects, the family must correct the defect within no more than 30 calendar days (or any PHA-approved extension).

(3) If the family has caused a breach of the HQS, the PHA must take prompt and vigorous action to enforce the family obligations. The PHA may terminate assistance for the family in accordance with § 982.552.

(Approved by the Office of Management and Budget under control number 2577–0169)

**Credits**
[60 FR 45661, Sept. 1, 1995]

AUTHORITY: 42 U.S.C. 1437f and 3535(d).

Notes of Decisions (27)

Current through November 2, 2018; 83 FR 55110.

---

**End of Document**　　　　　　　　　　　　　© 2018 Thomson Reuters. No claim to original U.S. Government Works.

> Code of Federal Regulations
>   Title 24. Housing and Urban Development
>     Subtitle B. Regulations Relating to Housing and Urban Development
>       Chapter VIII. Office of the Assistant Secretary for Housing–Federal Housing Commissioner, Department of Housing and Urban Development (Section 8 Housing Assistance Programs, Section 202 Direct Loan Program, Section 202 Supportive Housing for the Elderly Program and Section 811 Supportive Housing for Persons with Disabilities Program) (Refs & Annos)
>         Part 882. Section 8 Moderate Rehabilitation Programs (Refs & Annos)
>           Subpart E. Special Procedures for Moderate Rehabilitation—Program Development and Operation (Refs & Annos)

24 C.F.R. § 882.516

§ 882.516 Maintenance, operation and inspections.

Effective: January 6, 2016
Currentness

(a) Maintenance and operation. The Owner must provide all the services, maintenance and utilities as agreed to under the Contract, subject to abatement of housing assistance payments or other applicable remedies if the Owner fails to meet these obligations.

(b) Periodic inspection. In addition to the inspections required prior to execution of the Contract, the PHA must inspect or cause to be inspected each dwelling unit under Contract at least annually and at such other times as may be necessary to assure that the Owner is meeting the obligations to maintain the unit in decent, safe and sanitary condition and to provide the agreed upon utilities and other services. The PHA must take into account complaints and any other information coming to its attention in scheduling inspections.

(c) Units not decent, safe and sanitary. If the PHA notifies the Owner that the unit(s) under Contract are not being maintained in decent, safe and sanitary condition and the Owner fails to take corrective action (including corrective action with respect to the Family where the condition of the unit is the fault of the Family) within the time prescribed in the notice, the PHA may exercise any of its rights or remedies under the Contract, including abatement of housing assistance payments (even if the Family continues in occupancy), termination of the Contract on the affected unit(s) and assistance to the Family in accordance with § 882.514(e).

(d) PHA management. Where the PHA is managing units on which it is also administering the Housing Assistance Payments Contract pursuant to a management contract approved by HUD in accordance with § 882.412, HUD will make reviews of project operations, including inspections, in addition to required PHA reviews. These HUD reviews will be sufficient to assure that the Owner and the PHA are in full compliance with the terms and conditions of the Contract and the ACC. Should HUD determine that there are deficiencies, it may exercise any rights or remedies specified for the PHA under the Contract or reserved for HUD in the ACC, require termination of the management contract, or take other appropriate action.

(e) Periodic PHA audits must be conducted as required by HUD, in accordance with 2 CFR part 200, subpart F.

EXHIBIT D

**Credits**

[53 FR 8065, March 11, 1988; 80 FR 75941, Dec. 7, 2015]

AUTHORITY: 42 U.S.C. 1437f and 3535(d).; Section 8(e)(5), U.S. Housing Act of 1937 (42 U.S.C. 1437(e)(5)); sec. 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)); sec. 324, Housing and Community Development Amendments of 1981.

Notes of Decisions (58)

Current through November 2, 2018; 83 FR 55110.

End of Document                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.